**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 23, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SOUTHERN UTAH WILDERNESS
ALLIANCE,

      Plaintiff-Appellant,

    v.

OFFICE OF SURFACE MINING
RECLAMATION AND
ENFORCEMENT, and BUREAU OF
LAND MANAGEMENT,

      Defendants-Appellees,

   and

UTAHAMERICAN ENERGY, INC.,

      Intervenor.

No. 09-4003

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO.2:07-CV-678-DAK)**

---

Joshua M. Segal, Jenner & Block LLP, Washington, District of Columbia
(Stephen H.M. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, Utah,
and William M. Hohengarten, Jenner & Block LLP, Washington, District of
Columbia, with him on the briefs) for Plaintiff-Appellant.

Jared C. Bennett, Assistant United States Attorney (Brett L. Tolman, United
States Attorney, with him on the brief) Office of the Untied States Attorney, Salt
Lake City, Utah for Defendants-Appellees.

With submission on brief by Denise A. Dragoo and Troy L. Booher, Snell & Wilmer L.L.P., Salt Lake City, Utah, and John E. Jevicky, Dinsmore & Shohl LLP, Cincinnati, Ohio for Intervenor.

Before **TYMKOVICH**, **EBEL**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Southern Utah Wilderness Alliance (SUWA) fought for many years to prevent the permitting of the proposed Lila Canyon coal mine in Utah. SUWA's members include those who enjoy the aesthetic qualities of the canyon and its surroundings, and believe that allowing coal mining in Lila Canyon would disrupt its natural beauty.

In this appeal, SUWA challenges decisions made by two federal agencies that would allow UtahAmerican Energy, Inc. (UEI) to proceed in the development of the Lila Canyon Mine. First, SUWA challenges the district court's conclusion that the Bureau of Land Management (BLM) properly suspended UEI's coal lease and tolled the statutory diligent development period, thereby extending the time in which UEI could begin coal production. Second, SUWA objects to the district court's determination that the Office of Surface Mining Reclamation and Enforcement (OSM) did not violate its statutory duties when it declined to prepare an updated recommendation regarding UEI's mining plan.

This court has jurisdiction pursuant to 28 U.S.C. § 1291. We agree with the district court that BLM acted properly in determining UEI's lease is still valid, and that OSM was in conformity with its statutory duties when it declined to issue a new recommendation. Accordingly, we AFFIRM the district court's decision.

## I. Background

UEI is the owner of six coal leases located in Lila Canyon, Utah. These leases were assigned to UEI on September 22, 2000, from the previous owner.

Before UEI could begin mining these federal coal reserves, it had to obtain various state and federal approvals. According to the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201–1328, UEI had to obtain a SMCRA permit from the state of Utah. *See* 30 C.F.R. § 944.30 (delegating authority to Utah to issue mining permits on federal lands). From the federal government, UEI needed approval of a mining plan under the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. §§ 181–287, which falls under the authority of the Assistant Secretary for Land and Minerals Management in the Department of the Interior. To streamline application processes, a unified application packet for both the SMCRA permit and the MLA mining plan approval is submitted to the Utah Division of Oil, Gas, and Mining (Division of Mining)[1], and the portions

---

[1] In an effort to reduce the number of acronyms in this opinion, we have chosen the shortened description "Division of Mining." But in some quotes from

(continued...)

relevant to the MLA mining plan approval are sent to the federal agencies responsible for assisting the Assistant Secretary in making the decision—in this case, OSM. UEI submitted a unified packet application in order to obtain the necessary state and federal approvals to begin mining operations on its leases.

A. *State Permit Proceedings*

On July 27, 2001, the Division of Mining approved UEI's application for a surface mining permit. SUWA appealed this decision on September 4, 2001, to the Utah Board of Oil, Gas, and Mining, a panel responsible for overseeing the Division of Mining. In a decision dated December 14, 2001, the Board found that the Division of Mining granted the permit in error, since UEI had failed to provide sufficient data regarding certain aspects of the environmental impact of its proposed mining operations. The Board therefore remanded the permit to the Division for further proceedings, and the Division thereafter sought additional environmental data from UEI. UEI opted to simply comply with the Board's decision and follow the remanded permit process rather than exercise its right to seek appellate review of the Board's decision in the Utah Supreme Court.

Against this procedural backdrop, several federal laws bear keeping in mind. Federal coal leases are subject to a ten-year "diligent development" requirement. 30 U.S.C. § 207(a). If a lease fails to produce "commercial

_____

[1](...continued)
the record, this entity is referred to as the DOGM. Both shortened versions refer to the Utah Division of Oil, Gas, and Mining.

-4-

quantities" of coal within ten years, the lease "shall be terminated." *Id.* The Secretary of the Interior, however, has the authority to suspend the development period required by statute, "for the purpose of encouraging the greatest ultimate recovery of coal." 30 U.S.C. § 209. A lease owner may request a suspension through BLM. A suspension affects all requirements contained in a coal lease, and "tolls the ten-year diligent development period for the length of time the lease is suspended." *Hoyl v. Babbitt*, 129 F.3d 1377, 1380 n.2 (10th Cir. 1997).

The diligent development period for UEI's coal leases began to run on February 1, 1995. Therefore, without a suspension of its leases, UEI had only until February 1, 2005 to begin producing commercial quantities of coal.

Due to delays caused in part by the appeal brought by SUWA in 2001, UEI applied for a suspension of these leases on January 15, 2002. In its application to BLM, UEI listed as justifications for the suspension a government re-inventory of portions of the affected canyon lands, and legal challenges by SUWA, which had "resulted in a remand" of the state permit. JA 1054–55. UEI requested a four-year suspension.

BLM granted UEI's request for a suspension order on November 12, 2002, nearly eleven months after UEI first requested the suspension. Instead of granting the four-year suspension UEI requested, BLM ordered that the suspension would be "effective 4 September 2001," going back to the date of SUWA's appeal to the

Board, and "continue until 15 days after the final court decision of the SUWA appeal dated 4 September 2001." JA 1090.

Over the next few years, UEI continued to seek SMCRA permit approval from the Division of Mining, and SUWA continued its involvement in this process as well. During this period, as a condition of its lease suspension, UEI submitted annual reports to BLM certifying "that the conditions that warranted this suspension continue to exist." JA 1093; *see also* JA 1096–1098 (annual certifications describing the ongoing permitting process). UEI did not engage in any beneficial use of the leased areas, as this would have ended the suspension. All parties to the present litigation—UEI, BLM and SUWA—acted as though the suspension was in effect the entire time.[2]

On March 2, 2007, BLM issued a second order that "amended" the original suspension order of 2002. This new order stated that it had "come to the attention of this office that there is no court case pending in this matter."[3] JA 1122. According to this new order, the suspension was amended to terminate fifteen

---

[2] SUWA claims that the 2002 Order "was never published," Reply Br. at 17 n.5, and that its previous failure to assert its current argument about the length of the suspension therefore should not be held against it. In our view, whether the order was published or not will not affect our interpretation of it. In any event, we do not understand SUWA to argue it never knew about the 2002 Order.

[3] The order itself gives no indication of how this fact came to BLM's attention, and the rest of the record is silent on this question as well. Nor have the parties offered in their briefs any explanation of—as opposed to mere speculation on—the series of events leading up to the 2007 Order.

days after "completion of all State permit and Federal actions, including resolution of potential administrative and judicial appeals." *Id.*

### B. *Federal Permit Proceedings*

In addition to obtaining a surface mining permit from Utah, UEI was also required to obtain federal approval of an MLA mining plan before it could commence mining operations. It is the responsibility of the Department of the Interior to approve or disapprove an MLA mining plan as part of the permitting process. *See* 30 C.F.R. § 746.11. To assist the Department in making this decision, OSM prepares a recommendation based on the permit application package and other information regarding the proposed mining plan. *See* 30 C.F.R. § 746.13. Based on the information provided in UEI's original unified application packet, OSM recommended approval of the plan.

The Department approved UEI's mining plan on November 5, 2001, but UEI could not begin mining operations until it obtained its surface mining permit from the Division of Mining. In 2007, the Division approved a new surface mining permit, and UEI settled an appeal brought by SUWA later that year.

With the state mining permit finally in hand, UEI could begin mining operations—as long as the MLA approval from 2001 was still in effect. But SUWA was once again involved in the process, this time contacting OSM to request that it issue a new recommendation regarding the MLA mining plan, taking into account the additional information UEI had submitted during the

remanded state permit process. OSM considered the request and decided it was not legally obligated to do so because a new recommendation is only necessary for an approved MLA mining plan if that plan has been modified or canceled. OSM concluded the plan approved in 2001 had not been modified or canceled, and on June 26, 2007, informed SUWA it would not be preparing a new recommendation.

From both of these final decisions, SUWA appealed. The district court affirmed the agency actions, and SUWA appealed to this court. After this appeal began, UEI informed the court that it had begun beneficial use of the leased land in 2009, thus ending the suspension period granted in the 2002 and 2007 Orders.

## II. Analysis

The Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*, requires federal agencies to act reasonably and in accordance with applicable law. If they do not, courts may set aside those agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review of the lower court's decision is de novo, and we "owe no deference to the district court's decision." *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281 (10th Cir. 2001).

### A. Jurisdiction

Before turning to the substance of SUWA's appeal, we must first address our own jurisdiction to review the agency action—specifically, whether SUWA

has standing to bring this suit. The defendants do not seriously contest standing, but their abdication is not binding on our obligation to do so.

We review the question of SUWA's standing de novo. *See Stewart v. Kempthorne*, 554 F.3d 1245, 1254 (10th Cir. 2009). The doctrine of standing has been developed to ensure that federal courts only issue judgments regarding the "Cases" and "Controversies" that the Constitution gives them jurisdiction to hear. U.S. Const. art. III, § 2; *see Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1144 (10th Cir. 2010) (*en banc*) ("One essential and unchanging part of the case-or-controversy requirement is the concept that the plaintiff must have standing.") (internal quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

To show that he has Article III standing, a plaintiff must demonstrate three elements: injury in fact, traceability, and redressability. *See id.* To demonstrate an injury in fact, a plaintiff must show he has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* The element of traceability requires the plaintiff to show that the defendant is responsible for the injury, rather than some other party not before the court. *See id.* Finally, the requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision. *See id.*

Considering first the challenged BLM decision—i.e., that the ten-year diligent development period has not expired—SUWA's injury results from UEI's ability to commence mining operations. SUWA maintains the mining operations would impair the ability of its members to continue enjoyment of the aesthetic and scientific benefits provided by the land in question. When, as in this APA action, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotation marks omitted). Nevertheless, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing." *Id.* at 562–63 (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972)); *see also Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002) (environmental group has standing to challenge government action posing a threat to areas used for "recreational and educational purposes"); *Piney Run Preservation Ass'n v. County Comm'rs*, 268 F.3d 255, 263 (4th Cir. 2001) ("In an environmental case . . . a plaintiff need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area are lessened by the defendant's activity.") (internal punctuation omitted).

SUWA's amended complaint states that its members use the land affected by these permits for various purposes—scientific study, hunting, aesthetic

appreciation, sightseeing, and solitude.  They claim that the proposed mining operations would impair many, if not all, of these uses.  This is the type of injury that has often been used to demonstrate standing, so we conclude that SUWA meets the first prong of the standing inquiry.

The other two prongs of our standing inquiry are also met.  As to traceability, UEI could not engage in mining activity if its federal lease had expired.  Therefore, the decision by BLM that UEI's federal leases are still valid directly leads to the injury of which SUWA complains.  And a favorable court decision—for example, that UEI's coal leases have been terminated due to the expiration of the diligent development period—would result in UEI being unable to pursue mining operations, thus redressing SUWA's injury.  Therefore SUWA has standing to challenge the BLM decision.[4]

As to SUWA's standing to challenge the OSM failure to prepare a new recommendation regarding UEI's mining plan, the question is much closer.  OSM is not the final decision-maker in this instance, but instead only offers a recommendation to the Secretary of the Department of the Interior.  *See* 30 C.F.R. § 746.13 ("OSM shall prepare and submit to the Secretary a decision document

---

[4] SUWA also has standing to sue as an organization, due to the injuries suffered by its members.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

*recommending* approval, disapproval or conditional approval of the mining plan.") (emphasis added). Because of this, the most SUWA can allege is that OSM failed to carry out its procedural responsibilities and duties, not that it directly acted to harm the plaintiff. The district court concluded SUWA would be unable to prove any of the three requirements for standing on this claim. We disagree.

When a plaintiff raises "only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws," he does not have standing. *Lujan*, 504 U.S. at 573. Therefore, SUWA would not have standing to force OSM to conform to its statutory duties, if it was claiming no other injury than that the proffered duties had not been followed. But standing exists when a plaintiff can show that "the procedures in question are designed to protect some *threatened concrete interest of his* that is the ultimate basis of his standing." *Utah v. Babbitt*, 137 F.3d 1193, 1216 (10th Cir. 1998) (emphasis added) (quoting *Lujan*, 504 U.S. at 573 n.8). Our cases find standing where plaintiffs properly allege a procedural violation affecting a concrete interest because the "injury results not from the agency's decision, but from the agency's *uninformed* decisionmaking." *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996).

A recommendation from OSM, while not binding on the Secretary, is critical to the decision making process. It is meant to ensure that sufficient

-12-

information is before the Department so it can make an informed decision about the ultimate issue: whether to approve the mining plan.[5]  Although OSM does not make the final decision, its recommendation is a necessary part of the Secretary's decision to allow the commencement of mining operations.  This is the type of procedure put in place to "protect some threatened concrete interest," *Lujan*, 504 at 573 n.8.  In this case, the threatened interest is SUWA's interest in protecting the Lila Canyon area.  And that interest is impaired by the alleged procedural misstep.

Nor is SUWA required, for purposes of standing, to demonstrate that the ultimate decision would necessarily be different.  Standing exists even if the recommendation would not have been different, and even though the Secretary is not bound to follow the recommendation, even if it had changed.  *See Summers v.*

---

[5]  Our cases acknowledge procedural rights when an agency fails to undertake a required action before making a final decision.  Here, the final decision regarding mining plan approval was to be made by the Assistant Secretary for Land and Minerals Management, not OSM.  But because of the close relationship between OSM and the Assistant Secretary, we find this distinction legally irrelevant.  SUWA alleges OSM failed to follow the procedural requirements set forth by regulation, resulting in the Assistant Secretary making an uninformed decision that threatened its environmental interests at Lila Canyon.

It was OSM, not the Assistant Secretary, that allegedly failed to follow the regulations.  *See* 30 C.F.R. § 746.13 ("OSM shall prepare and submit to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan.").  It would be pointless to require SUWA to sue the Assistant Secretary, as the district court seemed to imply, since the last action taken by the Assistant Secretary in connection with this case was in 2001, when the Assistant Secretary originally approved the mining plan.

*Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009) ("[S]tanding existed . . . despite the possibility that . . . [plaintiff's involvement pursuant to a successful lawsuit] would not be successful in persuading the Forest Service to avoid impairment of [the plaintiff's] concrete interests.").

Because "the agency's uninformed decisionmaking," *Committee to Save the Rio Hondo*, 102 F.3d at 452, injured SUWA's concrete interests, the fact that OSM refused to issue an updated recommendation also satisfies the causation and redressability prongs—OSM's recalcitrance caused an allegedly uninformed decision, and this could be redressed by a favorable court decision, even if the Secretary's ultimate decision was the same. *See Babbitt*, 137 F.3d at 1216 n.37 (in the context of procedural rights, "the plaintiff need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision").

Therefore SUWA has Article III standing to challenge the OSM decision as well.

*B. Review of Agency Actions*

Before turning to the merits, we are mindful of a number of basic principles of administrative law. We first recognize that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). This deference is based on an agency's superior ability

to reconcile conflicting policy objectives, and its extensive knowledge of the specialized subject matter over which it has authority. *See id.* Where Congress entrusts enforcement of federal law to a particular agency, *Chevron* requires deference to agency regulations reasonably interpreting ambiguous language in the applicable law. *Id.* at 842.

A few other aspects of agency actions are also entitled to deference— although the amount of deference depends on the type of action being reviewed. For instance, the Supreme Court limited the most rigorous *Chevron* deference only to agency actions exercising congressionally-delegated authority "to make rules carrying the force of law." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (listing adjudication and notice-and-comment rulemaking as examples of *Chevron*-deference-worthy activity). The Court left open the possibility that less-formal agency actions may be entitled to a lesser amount of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (amount of deference depends on the agency's amount of consideration, persuasiveness of reasoning, and consistency with other agency pronouncements).

Another underlying purpose of agency deference is to "achieve predictable (and relatively litigation-free) administration of the vast body of complex laws committed to the charge of executive agencies," by "assur[ing] that reviewing courts will accept reasonable and authoritative agency interpretation of ambiguous provisions." *Couer Alaska, Inc. v. Se. Alaska Conservation Council*,

129 S. Ct. 2458, 2479 (2009) (Scalia, J., concurring). Although some insist that the Supreme Court's recent cases have "muddled" review of agency action, *see id.* (citing a law review article and collecting cases), the principle of deference to an agency's sphere of expertise continues to guide our review.

While informal agency orders, like the ones at issue in this case, fall short of actions that "make rules carrying the force of law," *Mead*, 533 U.S. at 226–27, they deserve at least some deference. And when an agency subsequently interprets its own order, we owe deference to this interpretation as well. *See Colo. Interstate Gas Co. v. FERC*, 791 F.2d 803, 810 (10th Cir. 1986) ("An agency's interpretation of its own order is entitled to great weight."); *see also Consumers Energy Co. v. FERC*, 428 F.3d 1065, 1067–68 (D.C. Cir. 2005) (an agency's interpretation of its own orders should be upheld "unless its interpretation is plainly erroneous or inconsistent with the order"). We take from this that the BLM orders here exemplify the types of decisions necessary to administer a complex regime of laws and regulations, and a delicate balancing of potentially conflicting policy considerations.

Finally, it is a long established rule that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943). But if the agency has not actually explained its reasoning, it is appropriate to rely on implicitly adopted rationales, *see Assoc. of Bituminous*

-16-

*Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1252 (D.C. Cir. 1998), as long as they represent the "fair and considered judgment" of the agency, rather than a "post hoc rationalization." *Auer v. Robbins*, 519 U.S. 452, 462 (1997).

With these principles in mind, we turn to the merits of the appeal.

*C. BLM's Suspension Orders*

SUWA's first argument challenges BLM's amendment of its coal lease suspension order, contending the amendment retroactively extended UEI's suspension period after the lease's due diligence period expired. If so, this action was improper, since federal law states that federal leases "shall be terminated" on the expiration of the diligent development period. *See* 30 U.S.C. § 207. If the lease already was terminated by the time BLM issued its 2007 Order, there was no more suspension period to extend. BLM rejects this argument. According to BLM, the suspension period never expired, and the 2007 Order merely clarified the intent and meaning of the 2002 suspension order.

As explained above, UEI sought a suspension order under 30 U.S.C. § 209 to obtain additional time in which to obtain the necessary permits during the due diligence period. Under federal law, a suspension is warranted if the government determines it is necessary to "encourag[e] the greatest ultimate recovery of coal." 30 U.S.C. § 209. A suspension under this section "tolls the ten-year diligent development period for the length of time the lease is suspended." *Hoyl*, 129 F.3d at 1380 n.2. Therefore, determining the length of the suspension is

-17-

necessary to calculate the amount of additional time UEI has in which to begin production of commercial quantities of coal.

The 2002 Order stated that UEI's leases would be suspended "until 15 days after the final court decision of the SUWA appeal dated 4 September 2001." This language refers to the September 2001 administrative appeal SUWA made to the Board after the Division of Mining granted UEI's surface mining permit. BLM's 2007 Order amended the termination date of the suspension until fifteen days after "completion of all State permit and Federal actions, including resolution of potential administrative and judicial appeals."

BLM asserts on appeal that its March 2007 Order clarified an ambiguity in the November 2002 Order. SUWA claims the 2002 Order is not ambiguous, and BLM's amendment violated § 209 by retroactively suspending the due diligence period required by law. We agree with BLM's interpretation of its order.

1. Ambiguity of 2002 Order

The heart of the disagreement between the parties is the meaning of the phrase "final court decision of the SUWA appeal dated 4 September 2001."[6] The trouble in determining the meaning of this phrase arises principally from the fact that SUWA's administrative appeal from September 2001 was never considered

_____

[6] The parties seem to agree, and the relevant statutes seem to indicate, that BLM could not retroactively extend a lease suspension if the leaseholder had already failed to meet the diligent development requirements. Therefore, the length of the lease suspension is outcome determinative.

by any court. In fact, by the time the suspension order was issued, (1) UEI was before the Division on remand working to obtain a revised permit, (2) UEI had never filed a court action, and (3) the time for judicial review had long passed. At this point, UEI had forfeited its opportunity to seek any judicial review of the 2001 SUWA appeal, and could only continue with the remanded administrative permitting process. There would never be a court decision—final or otherwise—regarding the merits of the 2001 SUWA appeal.

An order, if it is not ambiguous, must be enforced according to its plain meaning. *Cf. United States v. Hinckley*, 550 F.3d 926, 940 (10th Cir. 2008) (Gorsuch, J., concurring) (when statutory language is clear, "our inquiry ends where it began, and we enforce the statute's plain meaning"). But if the language of the order is ambiguous, we must turn to other sources to find its meaning. *See id.* The language used in a statute or, as in this case, an agency order, is ambiguous if it is "capable of being understood in two or more possible senses or ways." *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (quoting Webster's Ninth New Collegiate Dictionary 77 (1985)); *United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002). In determining whether language is ambiguous, we may look not only to the language itself, but also to the context in which the phrase appears, and the broader context in which the order was issued. *Cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself,

the specific context in which that language is used, and the broader context of the statute as a whole.").

The most obvious understanding of the phrase in question is that it referred to the final termination of a judicial proceeding, either in state or federal court, that dealt with the merits of SUWA's September 2001 appeal. But SUWA's September 2001 appeal never crossed a courtroom's threshold—it resulted in an administrative remand, which UEI did not appeal. Because UEI never appealed the Board's decision to remand the permit decision, no *court* decision was ever entered.

BLM argues that, given the facts of this case, the 2002 Order is ambiguous with respect to the event that would signal the termination of the suspension—that is, the absence of a judicial appeal left open the possibility of an indefinite suspension.

We agree that the order is susceptible to multiple understandings. In the context of the proceedings below, the phrase "final court decision" may result in at least three reasonable possibilities: *first*, since the condition never occurred, the suspension would continue indefinitely; *second*, a failure to seek judicial review within the allotted time is the equivalent of a final court decision affirming the remand, and therefore the suspension ended 15 days after the deadline for UEI to seek judicial review in the Utah Supreme Court; and *third*, BLM had in mind a final court decision that would eventually be entered after the permit remand

-20-

process and subsequent administrative and judicial challenges had taken their course.

No party argues for the first interpretation, although it probably qualifies as the most literal reading. SUWA endorses the second interpretation. BLM and UEI argue for the third. Each of these has merit, and none is foreclosed by the language of the order. Because the language has several plausible meanings in the context of the facts of the case, we agree with BLM and the district court that it is ambiguous. *Cf. Timken Co. v. United States*, 893 F.2d 337, 339 (Fed. Cir. 1990) ("The term 'final decision' can mean different things in different situations.").

We thus turn to the question of the appropriate interpretation of the 2002 Order.

### 2. Meaning of 2002 Order

Since the challenged phrase from the 2002 Order is capable of more than one interpretation, we must determine which one is proper. In so doing, we are guided by several principles of interpretation. First of all, agency orders are not to be read in a vacuum. We look to the plain language and context to guide our understanding. *Dominion Resources, Inc. v. FERC*, 286 F.3d 586, 590 (D.C. Cir. 2002) (using the agency order's "language and context" to interpret its meaning); *cf. Robinson*, 519 U.S. at 345 (the "broader context provided by other sections of the statute provides considerable assistance" in construing an ambiguous term); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S.

365, 371 (1988) ("Statutory construction . . . is a holistic endeavor," and ambiguous phrases can be clarified by the context of the rest of the statutory scheme, or by determining which is the only reasonably intended effect).

Importantly, as we noted above, we also owe substantial deference to an agency's interpretation of its own order. *Colo. Interstate Gas*, 791 F.2d at 810. In doing so, we evaluate an agency's interpretation by examining the entire context of the original order; looking to subsequent agency conduct, especially further orders; and by examining the agency's litigation position. *See Colo. Interstate Gas v. Natural Gas Pipeline Co.*, 885 F.2d 683, 688 (10th Cir. 1989).

Finally, we must bear in mind that "[a]dministrative orders, like statutes, are not to be given strained and unnatural constructions." *Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 686 n.5 (D.C. Cir. 1978).

In this case, all these considerations point in the same direction: in support of BLM's interpretation of the November 2002 Order.

### a. Context and Language

The context in which the 2002 Order arose, as well as other language in the order, indicate BLM was concerned UEI's coal leases might be terminated prematurely "due to appeals and actions beyond the scope of UEI's control." JA 1089. In the order, BLM recognized that, while "UEI has continued to pursue options to gain necessary permits," it "could lose the leases if the appeal delay is long enough to result in not meeting the diligent development requirements." *Id.*

-22-

These justifications for the suspension indicate that BLM intended to give UEI a suspension period long enough to obtain all the necessary permits.

Timing is also an important issue. The 2002 Order was issued *after* the Board had reversed the Division's decision to grant a permit, and had remanded the matter back to the Division for further development of the record. By the time BLM issued the order, the time had *already* expired for UEI to obtain judicial review of the remand decision. Under SUWA's interpretation, the suspension expired when the period for judicial review ended in March 2002—months *before* the order was issued in November 2002. According to this theory, the suspension was over before the order creating it was even published. This flatly contradicts other portions of the 2002 Order, annual reporting requirements among them.

The language contained in the order also indicates that BLM was aware of the remanded permit proceedings, including requirements that UEI correct the deficiencies in its previous application—which would only be possible in an administrative remand, not a judicial appeal of the remand decision. This requirement also implicitly endorses the conclusion that led to a remand—that is, UEI's original application was deficient—and belies the suggestion that BLM expected UEI to judicially appeal that determination. Thus, the overall language and construction of the order powerfully suggests BLM had in mind the entire permit appeal process.

SUWA argues the November 2002 Order merely reflects a mistake of fact. It suggests BLM was misinformed about the status of SUWA's September 2001 appeal at the time it issued its decision, and that it remained misinformed until 2007, when it issued the amended decision. If true, this would suggest that BLM had inadvertently allowed the suspension to go on longer than it had originally intended; upon discovering its mistake, BLM had a change of heart and granted UEI more time that it had originally meant to give. If the diligent development period had already expired, then BLM would be legally powerless to revive the suspension period.

This contention is not borne out by the record. First of all, as mentioned above, in the 2002 Order itself BLM speaks of the remand of the permit—"14 December 2001—Utah Board of Oil, Gas & Mining remanded the permit decision to DOGM"—and refers to it as a fait accompli, not something that UEI should or even could appeal. Nothing suggests BLM expected UEI to seek judicial review of the remand decision or that it was under any impression that judicial proceedings were pending. Rather, the order indicates an understanding that UEI was continuing on remand the permitting process before the Division of Mining. According to the 2002 Order, UEI needed suspension "due to appeals and actions beyond the scope of UEI's control," JA 1089, thereby indicating BLM's awareness of the ongoing proceedings.

Indeed, the BLM order explicitly points out that "UEI has continued to pursue options to gain necessary permits to begin mine development followed by production." *Id.* This diligence in pursuing a permit through the *administrative* process was regarded by BLM as a justification for the suspension. In fact, BLM stated that the suspension would be terminated unless UEI "correct[ed] deficiencies" in its permit application, JA 1093, thereby *requiring* UEI to proceed with the remanded permit proceeding as a condition of the suspension. For these reasons, the language of the entire order shows BLM intended the suspension to last until UEI had obtained the required permits and successfully fought off any court challenges to the agency decision.

In addition, to construe the 2002 Order as SUWA suggests would result in a difficulty of another sort. SUWA argues that we should adopt an interpretation consistent with the "plain meaning" of the 2002 Order. But at no time in these proceedings has there ever been even an initial court decision regarding the SUWA appeal, much less a "final court decision," since the question was never presented to any court. SUWA's interpretation would have us entirely ignore the word "court" in the order, allowing instead an administrative decision of remand to act as a surrogate for an actual court decision. While no doubt BLM could have constructed a clearer order, SUWA's interpretation merely highlights the ambiguity and confusion generated by the agency's choice of language. Presumably, BLM was intentional in its use of the word "court" and did not intend

for the suspension to terminate at the conclusion of a specific administrative appeal. *Cf. BP America Prod. Co. v. Burton*, 549 U.S. 84, 91–92 (2006) (Congress knows "how to identify administrative proceedings," and its use of the terms "action" and "complaint" indicated it had in mind only judicial proceedings).

The context and language of the 2002 Order therefore counsel against the interpretation set forth by SUWA.

### b. Deference to Agency Interpretation

Having considered the context and language of the 2002 Order, we turn to BLM's understanding of its order.

First, BLM's course of conduct is strong evidence in support of its interpretation. The 2002 Order established that the suspension period would terminate unless UEI submitted annual reports proving the conditions justifying the suspension still existed. UEI complied with this requirement, and in the annual reports never suggested to BLM that a court case was still pending. Instead, UEI accurately informed BLM that it was proceeding with the remanded permit process. *See* JA 1096 ("UEI is currently responding to the deficiencies identified in the DOGM Technical Analysis dated April 2003."); JA 1097 ("UEI responded to the DOGM TA [Technical Analysis] . . . and are awaiting an additional TA any day."); JA 1098 ("On June 13, 2005 UEI responded to the latest DOGM TA . . . .  In September the permit could be reissued at which time the appeal process would begin."); JA 1113 ("The Lila Canyon permitting process is

proceeding."); JA 1166 ("On May 2nd 2007 Utah Division of Oil, Gas and Mining once again approved the Lila Canyon permit. The issuance of the permit has been appealed[7] and is now undergoing the appeal process which could last several more months.").

BLM regarded these notices as substantively adequate, and considered the suspension effective during these years, as evidenced by its treatment of the leases. For instance, when UEI in 2004 suggested that it would like to conduct exploratory drilling on the leasehold properties, BLM informed UEI that such actions would be considered "beneficial use" of the leases, and would thus trigger the termination of the suspension. *See* JA 1177 (BLM's conclusion that it "cannot approve any exploration on the leases at Lila Canyon *while the leases are suspended*") (emphasis added). This demonstrates that even though BLM knew that UEI was pursuing a permit through the remanded process, it considered the suspension to still be in effect.

The annual notices further undermine the suggestion that BLM was misinformed about the status of the 2001 SUWA appeal. It is counter-intuitive to conclude that BLM believed UEI was continuing with the remanded permitting process even as it was awaiting a judicial determination of whether a remand was proper. Since BLM knew that UEI was pursuing a permit after a remand, its

---

[7] This refers to a further appeal by SUWA, which was settled on December 10, 2007.

behavior supports the conclusion that BLM considered the suspension to remain in effect until UEI actually obtained a permit at the conclusion of the remanded proceedings.

The 2007 Order reflects as much. In that order, BLM states it is clarifying the "duration of the suspension" since "it has come to our attention there is no court case pending in this matter." JA 1122. It therefore ordered that the "suspension is amended to terminate effective fifteen days after notification by the authorized officer following completion of all State permit and Federal actions, including resolution of potential administrative and judicial appeals." *Id.* This language comports with the essential understanding of the parties as reflected by their conduct in the five years following the 2002 Order, but much more clearly defines the end date of the suspension period.

SUWA makes much of the choice to title this order as a "Decision Amended." We see little moment in BLM's choice of language, and it has consistently taken the position that the amendment was to clarify the language in the 2002 Order, not a new or superceding agency action.

Agencies may clarify their ambiguous orders, even if their actions in so doing are "hardly tidy." *See Chesapeake & Ohio Ry. Co. v. United States*, 571 F.2d 1190, 1194 (D.C. Cir. 1977) (approving a later, clarifying order after an agency's "discernment of an ambiguity that needed clarification" in a previous order). Given our previous conclusion that the 2002 Order was ambiguous, we

agree with BLM that its 2007 Order was intended to clarify the language of suspension.[8]  The 2007 Order therefore represents BLM's belated recognition that its 2002 Order was confusing, due to the fact that there had been no judicial appeal of the remand decision, and its attempt to remedy that confusion.  The 2007 Order therefore made explicit what had been BLM's position all along—that the suspension was to remain in effect until a truly final decision was made on the state and federal permits.

Finally, we can consider the litigation position advanced by BLM, a defendant in this action.  *See Colo. Interstate Gas*, 885 F.2d at 688.  BLM claims that "the March 2007 order . . . simply clarified an ambiguity in the November 2002 Order to make it consistent with BLM's longstanding interpretation thereof."  Br. for Federal Appellees, p. 16.  It is telling that the rationalization BLM offers for its position now—the problems resulting from allowing coal leases to terminate due to appeals by third parties—is exactly the rationalization put forth in the 2002 Order.  This indicates that the interpretation currently advanced by BLM is the

---

[8] Although the 2007 Order contains the statement "[i]t has come to the attention of this office there is no court case pending in this matter," this too is of little concern.  As demonstrated by the annual statements from UEI, BLM was all along aware that UEI was pursuing a permit through the remanded process rather than awaiting a judicial decision on the propriety of a remand.  This precatory statement can instead be understood as BLM's recognition that its previous order was made ambiguous, or even nonsensical, due to the fact that a judicial appeal was never taken.

"fair and considered judgment" of the agency, and not a "post-hoc rationalization" to which we would accord no deference. *See Apfel*, 156 F.3d at 1252.[9]

We thus owe deference to BLM's interpretation of its order—that the suspension did not end with the expiration of the period for judicial review of the SUWA 2001 appeal.

### c. *"Strained and Unnatural Construction"*

Finally, we must avoid interpreting an agency's order in any way that results in "strained and unnatural constructions." *Belco Petroleum Corp.*, 589 F.2d at

---

[9] In its opening brief, SUWA for the first time raises a *Chenery* objection. SUWA claims that the phrase "it has come to our attention there is no court case pending in this matter" indicates BLM interpreted the 2002 suspension order as already expired by 2007. Therefore, SUWA claims, BLM cannot now try to support its 2007 Order on any other grounds.

"[A]bsent extraordinary circumstances, we will not consider arguments raised for the first time on appeal." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002). Before the district court, SUWA was confronted with BLM's explanation that it had always considered the 2002 suspension to remain in effect until UEI obtained the necessary leases. SUWA may have cited to *Chenery* in its opening brief before the district court, but only in a general manner, and it did not make the argument that it makes before this court—i.e., that the 2007 Order itself is evidence of the agency's rationale, binding it through *Chenery*. For this reason, we need not credit this shift in argument on SUWA's part.

Furthermore, even if we were to consider this argument on the merits, SUWA has failed to demonstrate that BLM ever actually adopted the rationale that SUWA claims is evident in its 2007 Order. The phrase quoted repeatedly by SUWA—"it has come to our attention there is no court case pending in this matter"—could just as easily indicate that BLM believed the 2002 Order, as written, would suspend the coal leases indefinitely, and therefore acted to clarify its previous order.

686. Perhaps that is not entirely possible here. On one hand, the interpretation advanced by SUWA would require us to read the suspension period as lasting a mere 185 days, in the face of BLM's explicit recognition of the multitude of negative consequences of allowing the lease to be terminated due to appeals outside of UEI's control. The 2002 Order itself envisions the suspension lasting at least a year if not a number of years, as evidenced by its requirement of annual statements. Under SUWA's suggested interpretation, the suspension came to an end eight months *before* BLM even issued its opinion, a result manifestly at odds with the language of the order, as well as with BLM's subsequent conduct.

On the other hand, the interpretation advanced by BLM, while not without potholes, is neither strained nor unnatural when viewed in the context of the entire order and course of proceedings, and of the circumstances that gave rise to the requested suspension in the first place.

In sum, SUWA can point to nothing in the record to suggest that BLM ever adopted SUWA's preferred interpretation of the 2002 Order. Instead, all the evidence in the record shows to the contrary that BLM always intended the suspension to last until UEI had obtained the necessary permits to begin mining operations, and has considered the suspension to be in effect for that entire period. For the foregoing reasons, we conclude that the suspension of the ten-year diligent development requirement remained in effect until UEI began beneficial use of its coal leases in July 2009.

*D.  OSM Failure to Issue New Recommendation*

SUWA also challenges OSM's decision not to issue a new recommendation

based on UEI's updated application packet.  We agree with the district court that

OSM was not legally required to issue a new recommendation.[10]

OSM is responsible for preparing a recommendation for the Secretary of the

Interior on proposed federal mining plans.  *See* 30 C.F.R. § 746.13.  The Secretary

is not required to follow the recommendation made by OSM, although the

recommendation is intended to play a part in supporting a well-informed decision.

This process of recommendation and approval is followed not only for any new

mining plan, but also for modifications of existing mining plans.  *See* 30 C.F.R.

§ 746.18(b).  But once a mining plan has been approved by the Secretary, it

remains in effect until it is "modified, cancelled or withdrawn."[11]  30 C.F.R.

_____

[10]  SUWA requests that, since we determined it had standing to challenge the OSM decision, we should remand to the district court for a determination of the merits of this question.  We decline to do so for two reasons.  First, in its determination of the standing question, the district court relied heavily on the merits of the issue.  Therefore, there is nothing to be accomplished in asking the district court to address this question again.  Second, this issue raises a question of law, not of fact, so this court is well suited to determine it.  *Cf. Davoll v. Webb*, 194 F.3d 1116, 1129 (10th Cir. 1999) ("If the applicability of the federal statute upon which a plaintiff relies is genuinely at issue, the federal courts possess jurisdiction and should reach the merits of the claim.").  The merits of this issue have been fully briefed, and were considered by the district court as well as this court, therefore remand is unnecessary.

[11] The factors used to determine whether "[p]ermit revisions constitute mining plan modifications" are found in 30 C.F.R. § 746.18(d) (factors include changes in scope or environmental impact of the proposed mine).

-32-

§ 746.17(b).  Therefore OSM is under no statutory or regulatory duty to provide a recommendation for a mining plan that has already been approved, unless the initial plan has been modified or canceled.

After the Division of Mining issued a state permit in 2007, SUWA requested that OSM prepare a new recommendation based on the updated submissions UEI had provided to the Division.  Relying on the regulations discussed above, OSM concluded that there had been no modification of the mining plan, and therefore it was not legally required to issue a new recommendation.[12]  OSM informed SUWA of its decision not to prepare a new recommendation in a letter written on June 26, 2007.  In the course of this litigation, SUWA conceded that the federal mining plan had never been modified, canceled, or withdrawn.

Under the APA, plaintiffs can challenge an agency's action or failure to act.  *See* 5 U.S.C. §§ 702, 706.  In a situation when a plaintiff claims that an agency has failed to act, the plaintiff must assert "that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original).  Construing this requirement, the Supreme Court has clarified that

> A "failure to act" is not the same thing as a "denial."  The latter is the agency's act of saying no to a request; the former is simply

---

[12]  OSM's initial position—expressed in communication with BLM—was that it needed to issue a new recommendation.  BLM challenged OSM's original legal analysis.  OSM eventually concluded that no new recommendation was required, and took this position in communications with SUWA.

> the omission of an action without formally rejecting a request—for example, the failure to promulgate a rule or take some decision by a statutory deadline.

*Id.* at 63. The letter from OSM to SUWA stating that it would not issue a new recommendation is properly viewed as a denial, not a failure to act. SUWA specifically requested a discrete agency action, and OSM formally denied the request. Since this is not a failure to act, SUWA may bring this claim under the APA without demonstrating that OSM was legally required to issue a supplemental recommendation.

Instead, we review this denial to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Examining the applicable regulations, OSM was only required to issue a new recommendation if there was a modification of the previously approved mining plan. That did not happen, and SUWA does not contend it did. We therefore agree with the district court that OSM was under no legal obligation to issue a new recommendation.

In sum, we agree with the district court that OSM's decision not to prepare a new recommendation based on UEI's updated application was not arbitrary or capricious.

## III. Conclusion

For the foregoing reasons, we conclude that the district court correctly rejected SUWA's challenge to BLM's decision regarding the suspension of UEI's

leases, and OSM's decision not to issue an updated recommendation.  Therefore,

the decision of the district court is AFFIRMED as stated above.

**Case No. 09-4003, *SUWA v. OSM, BLM, UtahAmerican Energy***
**EBEL, Circuit Judge, dissenting.**

The Southern Utah Wilderness Alliance (SUWA) brought this action against UtahAmerican Energy, Inc., and two bureaus of the Department of Interior—the Office of Surface Mining Reclamation and Enforcement (OSM) and the Bureau of Land Management (BLM)—in an effort to prevent UtahAmerican Energy from mining coal in Lila Canyon Mine, Utah.

SUWA's primary claim on appeal challenges the validity of UtahAmerican Energy's lease to mine coal. SUWA argues that UtahAmerican Energy failed to comply with statutory and regulatory requirements for the development of its mining operations. As a result of this noncompliance, SUWA contends that UtahAmerican Energy's lease to mine coal automatically terminated in August 2005. Both the district court and the majority opinion have rejected this argument. For the reasons that follow, however, I dissent from that conclusion.

SUWA's second argument on appeal stems from its claim in the district court that, if UtahAmerican Energy continues to hold a valid lease requirement, OSM must issue a new mining plan before UtahAmerican can begin its mining operations. The district court dismissed this claim because it concluded that SUWA lacked standing under Article III of the Constitution to raise the claim, and, in any event, there was no final agency action. Because I would conclude that UtahAmerican Energy lacks a valid lease to mine coal, I would not reach this issue. The majority opinion, however, reached this issue and concluded that

SUWA had standing to challenge OSM's failure to prepare a new recommendation regarding UEI's mining plan. In my view, if we need to reach this issue, we should conclude that SUWA lacks constitutional standing to raise that issue.

## DISCUSSION

### I. Termination of UtahAmerican Energy's Mining Lease

#### A. Standard of Review

In a case brought under the APA, as is the case here, we review the district court's decision de novo. Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1244 (10th Cir. 2008). In reviewing the challenged agency action, findings, or conclusions, we may set them aside if we conclude the agency was arbitrary and capricious or abused its discretion. See id.; see also 5 U.S.C. § 706(2)(A). Where an agency issues an ambiguous order, we will uphold the agency's subsequent interpretation of that order so long as it is not arbitrary and capricious. See Colo. Interstate Gas Co. v. Fed. Energy Regulatory Comm'n, 791 F.2d 803, 810 (10th Cir. 1986). An agency acts arbitrarily and capriciously where it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Lamb v. Thompson, 265 F.3d 1038, 1046 (10th Cir. 2001).

B. **Analysis**

In order to resolve whether UtahAmerican Energy's mining lease has expired or remains valid, the first issue we must address is whether BLM's November 2002 Order suspending UtahAmerican's obligations to comply with the development requirement is ambiguous with respect to when that suspension terminated. The majority concluded that it was, but I respectfully disagree. BLM's November 2002 Suspension Order reads as follows:

> The granting of this suspension of operations and production is effective 4 September 2001, and will continue until 15 days after the final court decision of the SUWA appeal dated 4 September 2001. The granting of this suspension of operations and production is subject to the attached stipulations, which are made part of this approval.

(Jt. App. at 1090.) In my view, BLM's November 2002 Suspension Order is susceptible to only a single interpretation: that the suspension period would last only so long as the judicial proceedings stemming directly from SUWA's September 4 objection lasted, and another fifteen days thereafter.

The language of BLM's November 2002 Suspension Order controls my interpretation of it. Not just once, but twice, the suspension order tethers itself to the SUWA's September 4 objection. First, it retroactively applies the suspension order to when SUWA filed its objection by making the suspension "effective 4 September 2001." (Id.) Next, it explicitly states that the suspension "will continue until 14 days <u>after the final court decision of the SUWA appeal dated 4</u>

<u>September 2001</u>."  (<u>Id.</u>)  This language indicates that once the "final court decision" stemming from the September 4 objection is issued, the suspension order will automatically expire.

The majority suggests that this language is outrageous and that the parties must have meant to say that the suspension would remain in effect throughout the time that the permitting process <u>could</u> be challenged.  That may very well have been the parties' intent, but that doesn't render the language ambiguious.  Words matter, and here the words chosen for this suspension order are simply not ambiguious.[13]

In sum, the November 2002 Suspension Order unambiguiously provided UtahAmerican Energy with a suspension that spanned from September 4, 2001, until March 8, 2002, a total of 185 days.  Absent this extension, UtahAmerican Energy would have had until February 1, 2005, to comply with its development requirements or have its lease terminated.  <u>See</u> 30 U.S.C. § 207(a) (providing that "[a]ny lease which is not producing in commercial quantities at the end of ten years shall be terminated").  The 185-day suspension gave UtahAmerican Energy

---

[1] In fact, BLM's March 2007 Amendment Order suggests that BLM operated under a mistake of fact when it issued the original November 2002 Suspension Order.  In explaining why it was amending the suspension termination date established in its November 2002 Suspension Order, BLM stated that, "<u>[i]t has come to the attention of this office</u> that there is no court case pending in this matter."  (Jt. App. at 1122 (emphasis added).)  That this fact "came to the attention" of BLM suggests that BLM had previously thought a court case was pending.

until August 5, 2005, to comply with its development requirement before its lease was terminated. Because BLM did not act to extend that deadline before it passed and because UtahAmerican Energy failed to comply with its development requirements before it passed, I would conclude that UtahAmerican Energy's lease terminated after it failed to meet the development requirements by August 5, 2005.

## II.    Standing

Because I would conclude that UtahAmerican Energy no longer holds a valid lease to mine coal, I would not reach the issue of whether SUWA has constitutional standing to raise its claim that OSM must approve a new mining plan for UtahAmerican Energy. Nonetheless, the majority has reached this issue and arrived at a conclusion with which I must respectfully disagree. Unlike the majority of this panel and the district court, whose conclusion on standing we review de novo, see Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 447 (10th Cir. 1996), if I needed to reach this issue, I would conclude that SUWA lacks standing under Article III of the Constitution to raise its claim related to the mining plan.

SUWA must satisfy the requirements for associational standing in order to raise this claim on behalf of its members. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); see also Colo. Taxpayers Union, Inc. v. Romer, 963 F.2d 1394, 1397 (10th Cir. 1992). To have associational standing,

SUWA would need to establish that (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." Colo. Taxpayers Union, Inc., 963 F.3d at 1397-98 (quotation omitted). In this case, the first requirement presents a problem for SUWA.

In order to show that its members would otherwise have standing, SUWA must show that its members could demonstrate the injury, causation, and redressability requirements derived from Article III. SUWA first must show that its members suffered "an injury in fact, defined as the invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Stewart v. Kempthorne, 554 F.3d 1245, 1253 (10th Cir. 2009) (quotation omitted). Next, SUWA must "demonstrate a causal connection between the injury and the conduct." Id. (quotation omitted). Finally, SUWA must establish that it is "likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." SUWA has failed to establish the second requirement.

In order to address whether SUWA has satisfied the causation prong, we must first identify its alleged injury. Here, SUWA asserts OSM had an obligation to prepare a recommendation for the Assistant Secretary regarding UtahAmerican

Energy's proposed mining plan. SUWA claims that OSM failed to comply with that procedural requirement, and, as a result, the Assistant Secretary was unable to make a fully informed decision about UtahAmerican Energy's proposed mining plan. Thus, SUWA alleges that its members were injured when the Assistant Secretary approved UtahAmerican Energy's proposed mining plan without the benefit of a recommendation by OSM.

But SUWA cannot establish a causal connection between this alleged injury and the conduct of the defendants because it resulted from the conduct of an independent third party not brought before the court. See City of Colo. Springs v. Climax Molybdenum Co., 587 F.3d 1071, 1080 (10th Cir. 2009) ("A plaintiff's injury is fairly traceable to the challenged action . . . where there is a causal connection between the injury and the conduct complained of—that is, where the injury is the result of the challenged action of the defendant and not the result of the independent action of some third party not before the court.") (quotation omitted, emphasis in original). OSM's failure to prepare a recommendation contributed to the Assistant Secretary's alleged uninformed decision on UtahAmerican Energy's proposed mining plan. However, the Assistant Secretary then approved the mining plan, and OSM had no control over that decision. It is this independent action of the Assistant Secretary approving the mining plan without a recommendation from OSM that caused injury to SUWA's members.

Yet, SUWA failed to join the Assistant Secretary as a defendant in this action. Therefore, it has failed to demonstrate that its injury is fairly traceable to the alleged conduct of the defendants because it failed to join the independent actor, the Assistant Secretary, that allegedly caused its members injury. See id.; see also Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1225 (10th Cir. 2008) (explaining that "where the independent action of some third party not before the court—rather than that of the defendant—was the direct cause of the plaintiff's harm, causation may be lacking") (quotation omitted).

In sum, then, I do not think we need to reach this issue because I would conclude that UtahAmerican Energy no longer holds a valid mining lease. But, if I were to reach this issue, I would part with my brethren in the majority and conclude that SUWA lacks constitutional standing to bring its claim related to UtahAmerican Energy's mining plan because it cannot satisfy Article III's causation requirement.

**CONCLUSION**

My disagreement with the majority's resolution of this case prevents me from joining its thoughtful opinion. Accordingly, I respectfully dissent on the grounds articulated above.