**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**July 23, 2014**

**TENTH CIRCUIT**

---

WILDEARTH GUARDIANS,

    Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; GINA
MCCARTHY, in her official capacity as
Administrator of the U.S. Environmental
Protection Agency,

    Respondents.

---

ARIZONA PUBLIC SERVICE
COMPANY,

    Intervenor - Respondent.

No. 13-9524

---

**ON PETITION FOR REVIEW BEFORE THE**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**(No. EPA-RO9-OAR-2010-0683)**

---

Ashley D. Wilmes, WildEarth Guardians, Louisville, Colorado, for Petitioner.

Martha C. Mann, Environmental Defense Section, (Robert G. Dreher, Acting Assistant
Attorney General, and Kristen Byrnes Floom, Environmental Defense Section, with her
on the brief), United States Department of Justice, Environment & Natural Resources
Division, Washington, DC, for Respondents.

Makram B. Jaber, (William L. Wehrum, Andrew J. Turner, Andrew D. Knudsen, with him on the brief), Hunton & Williams LLP, Washington, DC, for Intervenor - Respondent.

---

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.

---

**HARTZ,** Circuit Judge.

---

On August 24, 2012, the Environmental Protection Agency (EPA) promulgated a final Federal Implementation Plan (FIP) to reduce regional haze by regulating emissions of nitrogen oxides ($NO_x$) and particulate matter (PM) at the five units of the Four Corners Power Plant (the Plant) on the Navajo Reservation in northwestern New Mexico.[1] WildEarth Guardians (WildEarth) filed a petition under 42 U.S.C. § 7607(b)(1) for review of the FIP. It argued that promulgation of the FIP did not comply with the Endangered Species Act (ESA) because the EPA failed to consult with the Fish and Wildlife Service about the effect of the FIP even though the EPA had discretion to act to protect endangered fish near the Plant from mercury and selenium emissions. We deny the petition. WildEarth has contended that the EPA had four grounds for the exercise of discretion that could have benefitted the fish. But the principal ground was mooted by the closure of Plant Units 1–3 and two other grounds were not raised in WildEarth's

---

[1] *See* Source Specific Federal Implementation Plan for Implementing Best Available Retrofit Technology for Four Corners Power Plant: Navajo Nation (Final FIP), 77 Fed. Reg. 51620 (Aug. 24, 2012).

opening brief. As for the fourth alleged ground, it could not create a duty to consult under the ESA because it would have required the EPA to exceed the clearly delineated boundaries of the FIP.

## I.   BACKGROUND

### A.   Regulation of Four Corners Power Plant

The Plant is a coal-fired power plant located on the Navajo Reservation near Farmington, New Mexico. It is privately owned by Arizona Public Service Company (APS) and several other utilities. APS serves as the Plant operator. At the time of the rulemaking, the Plant consisted of five units; Units 1 and 2 were each rated to a capacity of 170 mega-watts (MW), Unit 3 was rated to a capacity of 220 MW, and Units 4 and 5 were each rated to a capacity of 750 MW.

In 1977 Congress amended the Clean Air Act to authorize the EPA to regulate regional haze to remedy "any existing[] impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1); *see id.* § 7491(a)(4),(b). Federal Class I areas are international parks, national wilderness areas, national memorial parks, and national parks that exceed a certain size. *See id.* § 7472. The regional-haze program has "goals and standards [that] are purely aesthetic rather than directly related to health and safety." *Oklahoma v. U.S. EPA*, 723 F.3d 1201, 1226 (10th Cir. 2013) (Kelly, J. concurring in part and dissenting in part); Henry N. Butler & Nathaniel J. Harris, *Sue, Settle, and Shut Out the States: Destroying the Environmental Benefits of Cooperative Federalism*, 37 Harv. J.L. & Pub.

3

Pol'y 579, 603 (2014) ("The [regional haze provisions] are designed to improve visibility in national parks and wilderness areas by decreasing pollution—a purely aesthetic goal unrelated to health.").

The process for regulating haze resembles that for regulating air pollutants for which the EPA has set national ambient-air-quality standards (NAAQS) under 42 U.S.C. §§ 7408 and 7409.[2]  Once a standard has been established for a pollutant, each state is responsible for developing a state implementation plan (SIP) to meet the standard by means such as setting emission limits for power plants and other stationary sources of pollution. *See id.* § 7410.  The SIP must be approved by the EPA; and if a state fails to submit a SIP, or if it fails to remedy a deficient SIP, the EPA is required to promulgate a FIP within two years. *See id.* § 7410(c).

For haze reduction the EPA does not set NAAQS, but it must (1) promulgate a list of Class I areas that are designated visibility areas based on a determination by the Secretary of the Interior that each area is one "where visibility is an important value of the area," *id.* § 7491(a)(2); and (2) promulgate regulations to assure "reasonable progress" toward the national goal of visibility in Class I areas, *id.* § 7491(a)(4).  States whose emissions may contribute to visibility impairment in designated visibility areas must issue SIPs that require operating stationary sources emitting air pollutants that can

---

[2] There are now NAAQS for six pollutants:  sulfur dioxide, particulate matter, nitrogen dioxide, carbon monoxide, ozone, and lead. *See Util. Air Regulatory Grp. v. EPA*, Nos. 12-1146, 12-1248, 12-1254, 12-1268, 12-1269, 12-1271, 2014 WL 2807314, at *3 (U.S. June 23, 2014).

4

contribute to visibility impairment to "procure, install, and operate, as expeditiously as practicable (and maintain thereafter) the best available retrofit technology [(BART)]" to reduce such emissions. *Id.* § 7491(b)(2)(A). The EPA must examine five factors when determining what is the BART:

> [1] the costs of compliance, [2] the energy and nonair quality environmental impacts of compliance, [3] any existing pollution control technology in use at the source, [4] the remaining useful life of the source, and [5] the degree of improvement in visibility which may reasonably be anticipated to result from the use of such [BART].

*Id.* § 7491(g)(2). Section 7491 does not, however, govern chemicals listed as "hazardous air pollutants" under Section 112 of the Clean Air Act, 42 U.S.C. § 7412(b). Section 112, under which the EPA sets emission standards for source polluters that emit hazardous air pollutants, states, "The provisions of [the regional-haze program] shall not apply to pollutants listed under this section." *Id.* § 7412(b)(6). Both mercury and selenium compounds are listed as hazardous pollutants. *See id.* § 7412(b)(1).

In the 1990 amendments to the Clean Air Act, Congress declared that in some situations Indian tribes should be treated as states for purposes of the Act. *See id.* § 7601(d). Congress left it to the EPA to specify the provisions of the Act "for which it is appropriate to treat Indian Tribes as States" and authorized the EPA to "promulgate regulations which establish the elements of tribal implementation plans [(TIPs)]." *Id.* § 7601(d)(2)–(3). Congress also provided that the EPA could at times directly administer regulations under a FIP on tribal land, similar to its power to issue a FIP if a state does not submit an acceptable SIP. *See id.* § 7601(d)(4). The EPA promulgated the Tribal

Authority Rule under these provisions in 1998. *See* 40 C.F.R. pt. 49 (2013). The rule

generally "authorize[s] eligible tribes to have the same rights and responsibilities as

States." *Id.* § 49.1. But recognizing that tribes would need more time than states to

investigate and submit TIPs, the EPA eliminated several time requirements for TIPs,

including the deadline for submitting specific visibility implementation plans. *See id.*

§ 49.4(e). It also determined that it could issue FIPs when "necessary or appropriate to

protect air quality . . . if a tribe does not submit a [proper TIP]." *Id.* § 49.11.

Because the Plant is on the Navajo Reservation, it is not regulated by any New

Mexico SIP. And the Navajo Nation has never submitted a TIP that would regulate the

Plant under the Clean Air Act. In 2007 the EPA issued the first FIP to cover the Plant,

which set emissions limits for sulfur dioxide ($SO_2$) and an opacity limit on various

emissions. In 2009 the EPA began the rulemaking process to issue a FIP to apply

regional-haze regulations to the Plant. The Plant is within 300 km of 16 Class I areas,

including the Grand Canyon, Mesa Verde, and Arches National Park.[3] The air quality

and visibility are impaired in each of the 16 areas. *See* Proposed FIP, 75 Fed. Reg. at

64224.

B.     The Endangered Species Act

_____

[3] *See* Source Specific Federal Implementation Plan for Best Available Retrofit
Technology for Four Corners Power Plant: Navajo Nation (Proposed FIP), 75 Fed. Reg.
64221, 64224 (Oct. 19, 2010).

Under the ESA, whenever a federal agency proposes an action in which it has discretion to act for the benefit of an endangered species, it must consult to insure that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.03 (2013) (§ 1536 applies "to all actions in which there is discretionary Federal involvement or control"). The acting agency consults with the U.S. Fish and Wildlife Service if the endangered species is a terrestrial or freshwater species or with the National Marine Fisheries Service if it is an anadromous or marine species. *See id.* § 402.01(b); *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1105 n.2 (10th Cir. 2010). *Agency action* is "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (2013).

The first step in the consultation process is to determine whether the proposed action "may affect a listed species or a critical habitat"; "[i]f so, the agency must consult." *Rio Grande Silvery Minnow*, 601 F.3d 1096 at 1105. If the agency decides its action may affect a listed species, it can decide whether to pursue formal or informal consultation. *See* 50 C.F.R. § 402.14(b) (2013). Informal consultation ends either in a finding that formal consultation is necessary or in a finding that "the action is not likely to adversely affect listed species or critical habitat," in which case "no further action is necessary." *Id.* § 402.13(a). Formal consultation is initiated by a written request that includes "[a] description of the action to be considered." *Id.* § 402.14(c)(1). It generally concludes in a biological opinion, *see id.* §402.14(l), which assesses "whether the action

7

is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," *id.* § 402.14(h)(3). If the biological opinion finds that jeopardy is likely, it must include, if possible, "reasonable and prudent alternatives" to the proposed action. *Id.* At that point "the agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007).

### C. Rulemaking at the Plant

In August 2009 the EPA published an Advanced Notice of Proposed Rulemaking asking for comments on its plan to regulate the Plant under the regional-haze program.[4] The New Mexico Attorney General commented that the EPA should consider the benefits of any control technologies on mercury emissions because mercury emissions from the Plant were high and affected the health of two nearby species of endangered fish—the Colorado pikeminnow and razorback sucker. The comment also asserted that the EPA was required to consult under the ESA on the effects of the rulemaking on endangered species. The EPA did not consult.

In October 2010 the EPA proposed a FIP for the Plant under the regional-haze rule. *See* Proposed FIP, 75 Fed. Reg. at 64221. The proposed FIP made a finding under

---

[4] *See* Assessment of Anticipated Visibility Improvements at Surrounding Class I Areas and Cost Effectiveness of Best Available Retrofit Technology for Four Corners Power Plant and Navajo Generating Station: Advanced Notice of Proposed Rulemaking (Advanced Notice), 74 Fed. Reg. 44313 (Aug. 28, 2009).

the Tribal Authority Rule that it was "necessary or appropriate" to establish the BART for $NO_x$ and PM emissions. *See id.* at 64222–23; 40 C.F.R. § 49.11(a) (2013). Both $NO_x$ and PM contribute to visibility impairment. *See* Proposed FIP, 75 Fed. Reg. at 64224. The EPA considered the five factors relevant to a BART determination, *see id.* at 64226–32, and proposed specified limits for both $NO_x$ and PM to be effective no later than five years after the effective date of the FIP. *See id.* at 64234–35.

In November 2010, APS submitted an alternative proposal to regulate $NO_x$ and PM. One utility owner had decided to divest from the Plant, and APS bought out its share in Units 4 and 5. As a result, APS decided to close Units 1–3 of the Plant. It proposed closing Units 1–3 early, by January 1, 2014, and then receiving a two-year extension (from the date for compliance in the proposed FIP) to install new selective-catalytic-reduction technology on Units 4 and 5. The EPA found that this plan would substantially reduce $NO_x$ and PM emissions three years before the EPA proposal would require reductions and would "produce approximately 30% less $NO_x$ emissions per year than EPA's BART proposal beginning in 2019."[5] The EPA then prepared and circulated for comments an alternative plan incorporating (but modifying) APS's proposal. *See id.* at 10530, 10535.

---

[5] Supplemental Proposed Rule of Source Specific Federal Implementation Plan for Implementing Best Available Retrofit Technology for Four Corners Power Plant: Navajo Nation (Supplemental FIP), 76 Fed. Reg. 10530, 10535 (Feb. 25, 2011).

In May 2011, WildEarth and other environmental groups submitted comments on the supplemental FIP, arguing that the EPA was required to consult with the Fish and Wildlife Service under Section 7 of the ESA because the proposed FIP would have an effect on the endangered Colorado pikeminnow and razorback sucker, which live in the nearby San Juan River. WildEarth pointed to high levels of mercury and selenium emitted by the Plant and argued that the EPA had to consult "given that the EPA itself notes that its proposal could lead to greater control of mercury emissions," which would benefit the endangered fish. J.A., Vol. II at 349. WildEarth's comments did not suggest any specific way in which the FIP could be revised to lead to a greater decrease in mercury or selenium emissions, except to suggest that the EPA regulate those pollutants directly. The EPA still did not consult.

**D.      Final FIP**

The EPA promulgated its final FIP for the Plant on August 24, 2012. It found that it was necessary or appropriate to "require[e] [the Plant] to meet new emission limits for $NO_x$ and PM." 77 Fed. Reg. at 51621. The FIP required PM emissions from Units 4 and 5 to be limited to 0.015 pounds per million British thermal units (lbs/MMBtu). *See* Federal Implementation Plan Provisions for Four Corners Power Plant, Navajo Nation, 40 C.F.R. § 49.5512(i)(1) (2013). It allowed the Plant a choice of how to meet $NO_x$ requirements; the Plant could either (1) add postcombustion controls on all units within the next five years to meet a limit of 0.11 lb/MMBtu, or (2) close Units 1–3 by January 1, 2014, and reduce $NO_x$ emissions on Units 4 and 5 to 0.098 lb/MMBtu by July 31, 2018.

10

*See id.*  The EPA made a finding that the alternative proposed by APS, which included closing Units 1–3, would "result in greater visibility improvement in surrounding Class I areas at a lower cost" than the original BART proposal.  Final FIP, 77 Fed. Reg. at 51621.

The EPA also evaluated reductions in emissions of other pollutants that would be achieved under the two options.  Under Option 1, the EPA's proposed BART, the EPA calculated that mercury emissions would drop from 594 lb/yr to 340 lb/yr, a decrease of approximately 43%.  Under Option 2, the alternative proposed by APS, the EPA calculated that mercury emissions would drop even further—to 233 lb/year, a decrease of approximately 61%.  The EPA did not estimate decreases in selenium directly, but the EPA's regulations allow facilities to measure total filterable PM as a surrogate for nonmercury metals, such as selenium.[6]  The EPA estimated that under Option 1 total PM emissions would fall from 1,564 tons per year to 1,179 tons per year, a decrease of 25%, whereas under Option 2 total PM emissions would fall from 1,564 tons per year to 886 tons per year, a decrease of approximately 43%.

The EPA also responded to comments it had received, including the WildEarth comment that it needed to consult under the ESA.  It said:

---

[6] *See* National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired Electric Utility Steam Generating Units and Standards of Performance for Fossil-Fuel-Fired Electric Utility, Industrial-Commercial-Institutional, and Small Industrial-Commercial-Institutional Steam Generating United (MATS Rule), 77 Fed. Reg. 9304, 9367–68 (Feb. 16, 2012).

EPA disagrees with the commenter that determining BART and promulgating this FIP for [the Plant] necessitates ESA Section 7 consultation.  EPA understands that the U.S. Fish and Wildlife Service (FWS) is primarily concerned about the effects of mercury and selenium on endangered fish species in the San Juan River.  EPA notes that under the BART Alternative [Option 2], mercury and selenium emissions will be reduced from [the Plant] due to the closure of Units 1–3.  Additionally, EPA's national [Mercury Air Toxics Standards (MATS)] rule set new emission limits for mercury that would apply to Units 1–3 at [the Plant] if those units continue operation.  EPA further notes that the goal of the Regional Haze Rule is to reduce emissions of visibility-impairing pollutants in order to restore visibility to natural conditions at the mandatory Federal Class I areas, and mercury and selenium do not affect visibility.  Therefore, EPA does not have authority to regulate emissions of mercury or selenium under BART.

Final FIP, 77 Fed. Reg. at 51643–44.

WildEarth filed a petition for review on October 22, 2012.[7]  APS elected Option 2 of the FIP, shutting down Units 1–3 on December 30, 2013.

## II.    DISCUSSION

Under the Administrative Procedure Act, this court can set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  WildEarth's opening brief contends that the EPA's failure to consult under the ESA rendered the FIP not in accordance with the ESA and arbitrary.  It argues that the ESA required the EPA to consult because the EPA had discretionary authority under the Clean Air Act to include additional measures in the FIP

_____

[7] The petition was originally filed in the Ninth Circuit.  The Ninth Circuit granted permission for APS to intervene.  Responding to a motion to dismiss or transfer filed by the EPA, the Ninth Circuit ruled that the proper venue is the Tenth Circuit and transferred the case.

12

to protect the endangered fish from mercury and selenium emissions from the Plant. The EPA and APS respond that the EPA had no such discretionary authority and no duty to consult. WildEarth has contended that the EPA had discretion to take four additional steps to reduce mercury and selenium emissions from the Plant that it may have taken if it had consulted before issuing the FIP: (1) requiring baghouses (emissions filtering devices) on Units 1–3 of the Plant; (2) requiring APS to act sooner to employ selective catalytic reduction on Units 4 and 5; (3) regulating sulfur dioxide emissions from the Plant, with the collateral result of reducing mercury and selenium emissions; and (4) directly regulating mercury and selenium emissions from the Plant. But the first possibility has been mooted by the closure of Units 1–3; the second two possibilities were not presented to this court by WildEarth in a timely fashion, so we need not consider whether the EPA had discretion to take those steps in the FIP; and the EPA had no duty to consult with respect to the fourth possibility. Because WildEarth has not properly presented a nonmoot ground for requiring the EPA to consult, we must deny its petition. We address the four grounds in turn.

### A. Baghouses

In its opening brief on appeal, WildEarth placed primary reliance on the argument that the EPA could have required baghouses on Units 1–3 of the Plant if consultation had convinced it of the need for further mercury and selenium emission reduction. Its theory was that in determining BART, (1) the EPA needed to consider "nonair quality environmental impacts," 42 U.S.C. § 7491(g)(2); (2) the impact from the deposition in

13

local streams of mercury and selenium emitted by the Plant was an impact of that type; and (3) consultation could have led the EPA to require baghouses (which reduce $NO_x$ and PM emissions) as part of the FIP because of their added advantage in reducing mercury and selenium emissions. Now, however, Units 1–3 have been closed. This theory of relief has therefore been mooted. There is nothing this court could do that would lead the EPA ultimately to impose a baghouse requirement on facilities that have been permanently shut down. *See Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 792 (10th Cir. 2010) ("The core question in mootness inquiry is whether granting a present determination of the issues offered will have some effect in the real world." (internal quotation marks omitted)).

### B. Timing of FIP Implementation

Recognizing that the baghouse issue is moot, WildEarth has presented its three other suggestions of how consultation could have led to reduced emissions of mercury and selenium. One suggestion, raised by WildEarth in a postbriefing letter to the court submitted under Fed. R. App. P. 28(j), was that the EPA could write the FIP alternative to require APS to implement selective catalytic reduction on Units 4 and 5 before the current July 31, 2018 deadline. But WildEarth did not make this argument in its opening brief. The only mentions of selective catalytic reduction in WildEarth's opening brief are in the fact section describing the plan adopted in the FIP and a quote from the record that "the [U.S. Government Accountability Office] reported that selective catalytic reduction—one of the options under consideration [and ultimately selected] for $NO_x$

14

controls at [the Plant] and [another nearby plant]—also substantially contributes to reductions in mercury emissions." Aplt. Br. at 41 (internal quotation marks omitted). The brief's only mention of the timing of installation is in a footnote that refers to Units 1–3, not Units 4 and 5: "EPA also has the discretion to determine the date for the installation and operation of the new pollution controls. The longer [the Plant's] Units 1, 2, and 3 operate, the more mercury is released into the Four Corners region by the plant." *Id.* at 45 n.14. These references hardly alerted opposing counsel or the court that WildEarth was suggesting that consulting with the Fish and Wildlife Service could lead to advancing the date for installation of selective-catalytic-reduction technology on Units 4 and 5. "[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). The fact that another argument for relief has now failed (as moot) is no excuse for raising a new argument at this stage of the appeal. We therefore do not consider whether the EPA had discretion to consider whether it could advance the date for installing selective-catalytic-reduction technology and, if so, whether that discretion triggered a duty to consult.

## C.     Regulation of Sulfur Dioxide

WildEarth's other untimely suggestion, also raised in a 28(j) letter, is that the EPA could have regulated $SO_2$ in this rulemaking and, had it chosen to do so, it could have required specific control technologies for $SO_2$ reduction that would have further reduced mercury emissions from Units 4 and 5. This argument was not adequately presented in

WildEarth's opening brief.  SO$_2$ was mentioned only once in the brief, in the discussion of an expert report that described benefits of various control technologies; WildEarth made no argument that the EPA could have regulated SO$_2$ in this FIP.  Hence, we decline to consider the argument.

### D.        Regulation of Mercury and Selenium

This leaves only WildEarth's fourth argument—namely, that as part of the FIP the EPA could have regulated mercury and selenium directly (rather than as a collateral product of other regulation, such as establishing the BART) and that this discretion to regulate triggered a duty to consult.  Before we address the merits of this argument, however, we must resolve whether we have jurisdiction to do so.

### 1.        Standing

"The Constitution limits the exercise of the judicial power to 'cases' and 'controversies.'"  *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1181 (10th Cir. 2012).  This limitation restricts the federal judicial power "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of the law."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  "The doctrine of standing is one of several doctrines that reflect this fundamental limitation."  *Id.* at 493.

To establish Article III standing:

a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

16

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These three requirements are commonly referred to as injury, causality, and redressability.

WildEarth's alleged injury—lack of consultation before promulgation of a final FIP—is one of process, not result. For a procedural injury, the requirements for Article III standing are somewhat relaxed, or at least conceptually expanded. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). First, for an injury in fact WildEarth "need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision." *Utah v. Babbitt*, 137 F.3d 1193, 1216 n.37 (10th Cir. 1998). It suffices that the procedures "are designed to protect some threatened concrete interest of [the person] that is the ultimate basis of standing." *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1234 (10th Cir. 2010) (emphasis and internal quotation marks omitted). "[W]here plaintiffs properly allege a procedural violation affecting a concrete interest[,] . . . the injury results not from the agency's decision, but from the agency's uninformed decisionmaking." *Id.* at 1234 (emphasis and internal quotation marks omitted). Thus, WildEarth need show only that compliance with the procedural requirements *could* have better protected its concrete interests. Similarly, to establish redressibility it need show only that the injury—lack of an informed decision—could be redressed by requiring the

17

agency to make a more informed decision. *See id.* at 1235 ("[T]he fact that [the agency] refused to issue an updated recommendation also satisfies the causation and redressability prongs—[the agency]'s recalcitrance caused an allegedly uninformed decision, and this could be redressed by a favorable court decision, even if the Secretary's ultimate decision was the same.")

The EPA and APS do not dispute (and we agree) that WildEarth has associational standing if Mike Eisenfeld, a WildEarth member who lives not far from the Plant in Farmington, has standing. But they challenge *his* standing under Article III.

Eisenfeld submitted an affidavit outlining the factual basis on which WildEarth asserts standing. It describes his enjoyment of the San Juan River:

> My family and I enjoy floating numerous stretches of the San Juan River every year. We have a raft and our friends have river boats as well. We float the San Juan River in Farmington, as well as on stretches downstream in Utah. We swim in the river when we float. We enjoy floating the river, but normally avoid the most polluted sections as we enjoy floating in areas that are more natural and that seem cleaner. We normally float the San Juan three times a year and intend to do so throughout the foreseeable future. We intend to float the river in June and July of this summer.

Aplt. Br. Attach. 2 (Declaration of Mike Eisenfe[l]d), at 7. It then goes on to explain the relationship between his river activities and the endangered fish:

> I enjoy looking for and viewing all species of fish in the San Juan River. When I am rafting in the San Juan River or taking a walk by the river in Farmington, I often look for fish, including the Colorado pikeminnow and razorback sucker. Unfortunately, their diminished numbers makes them very hard to find. I will continue to recreate in and around the San Juan River and its tributaries, and will continue to look for fish, including the Colorado pikeminnow and razorback sucker. I hope to point out one of these fish to my children in the future. My enjoyment of the Colorado

18

River System would be increased if the Colorado pikeminnow and razorback sucker recovered from their current endangered status and were more abundant.

*Id.* at 8–9.

APS first argues that Eisenfeld has not shown the requisite injury. According to APS, his alleged injury is not "concrete and particularized" because it shows only "concern over future environmental harm." Intervenor Br. at 27 (internal quotation marks omitted). We disagree. Eisenfeld swore that he uses the river for recreational purposes and he often looks for and views the endangered fish while using the river. "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing." *S. Utah Wilderness Alliance*, 620 F.3d at 1233 (internal quotation marks omitted); *see also Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002) ("To establish an injury-in-fact from failure to perform a NEPA [(National Environmental Policy Act)] analysis, a litigant must show: (1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm; and (2) that this increased risk of environmental harm injures its concrete interest."). APS correctly points out that the FIP would not increase emissions of mercury or selenium, so Eisenfeld cannot possibly be worse off under the FIP than he was beforehand. But the proper comparison is between what happens under the FIP and what WildEarth contends could have happened had there been consultation before its promulgation. *See Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 783–84 (9th Cir.

19

2014) (en banc) (because consultation could lead agency to revise contracts in ways beneficial to endangered species, group had standing to challenge lack of consultation); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013) (environmental groups had standing to challenge revised regulation regarding hazardous air pollutants on the ground that the revisions could have been more stringent than revised regulations adopted by agency).

APS's reliance on *Wyoming v. United States Department of Interior*, 674 F.3d 1220, 1237 (10th Cir. 2012), is misplaced. Our holding that the petitioners lacked standing was based on their failure to claim an *environmental* injury, not, as APS suggests, on the ground that the potential nonenvironmental injury was too speculative.

We next turn to the argument by the EPA (joined by APS) that WildEarth has failed to show causation; that is, that WildEarth has not shown that Eisenfeld's injury is fairly traceable to the EPA's violation of the ESA. EPA argues that because the "FIP does not license or in any other way authorize the general or continued operations of [the Plant, it is] causally unrelated to the Plant's mercury and selenium emissions." Aplee. Br. at 29. WildEarth responds that the EPA had a duty to consult about the dangers from emissions of mercury and selenium to the endangered fish and that such consultation may have led to measures that would have reduced these emissions beyond what the FIP requires. Perhaps WildEarth is incorrect and there was no duty to consult; but that is a merits issue, not an issue for standing. *See Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) ("If correct on the merits, *as we must assume for standing purposes*, such a

20

challenge presents a clearly redressable injury." (emphasis added)). And insofar as EPA is arguing that the failure to consult caused no harm to Eisenfeld's interests because the FIP did not increase emissions of mercury or selenium from the Plant, it repeats APS's error in the injury argument; the failure to consult may have caused injury to Eisenfeld because it eliminated the possibility that the FIP could have reduced those emissions still further.

Finally, the EPA (again joined by APS) argues that WildEarth has failed to satisfy the redressibility requirement for standing. It says that this court cannot redress WildEarth's injury because it was not permitted to regulate mercury and selenium in this rulemaking, and therefore any decision to require the EPA to consult on the effects of mercury and selenium could not influence the final decision. As with the EPA's causation argument, this is a merits argument. To show redressibility for an alleged procedural violation of the ESA, a plaintiff "need[s] to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008). WildEarth contends that the EPA could have made a decision that would have further reduced mercury and selenium emissions from the Plant. EPA argues otherwise, but that is a contention that WildEarth has standing to present. If WildEarth ultimately failed to persuade us of its contention, it would lose on the merits. In resolving a standing issue, however, we must start from the premise that the plaintiff will prevail on

21

its merits argument.  *See Sierra Club*, 699 F.3d at 533; *Salmon Spawning & Recovery Alliance v. U.S. Customs & Border Prot.*, 550 F.3d 1121, 1131 (Fed. Cir. 2008).

Having established that WildEarth does have standing to challenge the FIP on the ground that the EPA should have consulted because the FIP could have directly regulated mercury and selenium, we turn now to the merits of the challenge.

### 2.      Duty to Consult

WildEarth argues that the EPA had the duty to consult because the EPA had discretion to directly regulate mercury and selenium in the FIP.  But even if the EPA had power to regulate these hazardous air pollutants in a FIP rulemaking,[8] the EPA's "action" did not encompass the possibility of such direct regulation, and the subject matter of the duty to consult is limited to the agency's action.  We explain.

The ESA provides:

---

[8] We are not convinced that the EPA has the power to directly regulate mercury and selenium through a FIP under the Tribal Authority Rule.  Mercury and selenium compounds are "hazardous air pollutants," which are regulated under Section 112 of the Clean Air Act, codified at 42 U.S.C. § 7412.  That section is separate from the sections on regional haze, *id.* § 7491 et seq., and the sections that lay out the National Ambient Air Quality Standards, *id.* § 7409 et seq.  State implementation plans come under the second two programs, *see id.* §§ 7410, 7491(b)(2); but the hazardous-air-pollutant regulations are emission standards that apply directly to source polluters, and the EPA directly enforces these regulations through civil or criminal actions.  *See id.* § 7413(a)(3); *United States v. B & W Inv. Props.*, 38 F.3d 362, 366 (7th Cir. 1994).  Although a state can incorporate the hazardous-air-pollutant regulations in its SIP "in order to receive a general delegation of [Clean Air Act] implementation authority," *US Magnesium, LLC v. U.S. EPA*, 690 F.3d 1157, 1160 (10th Cir. 2012), we fail to see how the EPA could make a finding under the Tribal Authority Rule that its own regulations were so inadequate that further regulation of such pollutants in a FIP was "necessary or appropriate to protect air quality," 40 C.F.R. § 49.11 (2013).

22

Each federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or of Commerce], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species.

16 U.S.C. § 1536(a)(2). Thus, the duty to consult is bounded by the agency action.

Consultation is called for to ensure that the *action* does not jeopardize endangered or

threatened species. The written request to consult does not describe all the things that the

requesting agency might have power to do but includes only "[a] description of the *action*

to be considered." 50 C.F.R. § 402.14(c)(1) (2013) (emphasis added).

*Action* is defined as:

all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

*Id.* § 402.02. "Of particular significance is the affirmative nature of these words—

'authorized, funded, carried [out]'—and the absence of a 'failure to act' from this list.

This stands in marked contrast to other sections of the ESA, which explicitly refer to an

agency's failure to act." *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1107–08 (9th

Cir. 2006). In *Western Watersheds* the Bureau of Land Management had interpreted the

Federal Land Policy Management Act to exempt certain vested water rights on federal

lands from the Bureau's control. *See* 468 F.3d at 1104–05. The Bureau stated that it

would regulate these existing water rights only if the right-of-way holder substantially

23

deviated from the existing use or location of the ditch or canal. *See id.* at 1105. Environmental groups argued that the Bureau was required to consult under the ESA because it was making a "continuing decision not to enforce its regulatory discretion," which amounted to affirmative action. *Id.* at 1109. The Ninth Circuit disagreed, holding that "[t]he [Bureau]'s challenged 'action' stands in marked contrast to cases involving truly 'affirmative' actions." *Id.*; *see also Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 83 n.3, 84 n.6 (D.C. Cir. 1997) (decision to refrain from regulating baiting was likely not an action, and therefore would probably not trigger compliance with NEPA or ESA requirements); *cf. Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1123 (10th Cir. 2009) (federal agency's failure to exercise authority to amend a permit was not an action and therefore did not trigger duty to perform environmental analysis under NEPA).

Just as the ESA consultation requirement cannot be invoked by characterizing agency nonaction as action, it cannot be invoked by trying to piggyback nonaction on an agency action by claiming that the nonaction is really part of some broader action. When an agency action has clearly defined boundaries, we must respect those boundaries and not describe inaction outside those boundaries as merely a component of the agency action. Expanding in that manner the scope of what constitutes the "action" would make meaningless the regulation requiring an agency seeking formal consultation to include "[a] description of the action to be considered." 50 C.F.R. § 402.14(c)(1) (2013). The agency would have to set forth everything it might do. And requiring consultation on everything the agency might do would hamstring government regulation in general and

24

would likely impede rather than advance environmental protection. *Cf. Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1246 ("No agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had power to act but did not do so.").

We recognized this proposition in an earlier decision involving the same Plant at issue here. In *Arizona Public Service Co. v. United States Environmental Protection Agency*, 562 F.3d 1116, 1131 (10th Cir. 2009), we considered the 2007 FIP promulgated for the Plant by the EPA. *See id.* at 1121. The FIP set opacity limits and emissions limits for some pollutants. *See id.* Environmental groups argued that the limits were inadequate and that the Tribal Authority Rule required the EPA "to submit a plan meeting the completeness criteria [that would be required for a SIP]." *Id.* at 1125. We rejected the claim, holding that when regulating under the Tribal Authority Rule, the EPA had discretion to regulate in steps. *See id.* We said that requiring the EPA to regulate as if it were promulgating a SIP would "prevent the EPA from implementing any plan as necessary or appropriate to protect air quality, absent a comprehensive analysis of all air quality problems in an area." *Id.* (internal quotation marks omitted). "[S]ome regulation of the Plant," we said, "is better than none at all." *Id.*

Likewise, the EPA here decided to take action, but bounded the scope of that action. The EPA's authority under the Tribal Authority Rule is limited to actions that it determines to be "necessary or appropriate to protect air quality," 40 C.F.R. § 49.11 (2013), and the principal finding supporting the FIP was the finding that it was

25

"necessary or appropriate" to establish the BART at the Plant for $NO_x$ and PM emissions. Proposed FIP, 75 Fed. Reg. at 64222–23 (internal quotation marks omitted); Final FIP, 77 Fed. Reg. at 51621.[9] The scope of the EPA's "action" was establishing that BART. And the possibility that the EPA would have discretion—in some other regulatory proceeding—to directly regulate mercury and selenium emissions at the Plant[10] did not impose a duty to consult under the ESA before taking the only action under consideration at the time. Life is short. The EPA can, and by necessity must, proceed step by step. It did not promulgate the $NO_x$ and PM haze requirements for the Plant until 35 years after the 1977 amendments to the Clean Air Act. Requiring it to consult about all pollutants

[9] The FIP also "conclude[d] that it is necessary or appropriate to set enforceable fugitive dust/PM suppression measures to protect ambient air quality." Final FIP, 77 Fed. Reg. at 51643. This additional finding does not affect our analysis.

[10] We note that the EPA has promulgated a regulation that directly addresses the plant's mercury and selenium emissions: the MATS rule. The MATS rule applies to all coal-fired power plants in the United States that have a "combustion unit of more than 25 megawatts [and] serve[] a generator that produces electricity for sale." *See* MATS Rule, 77 Fed. Reg. at 9367. It sets a limit on mercury emissions of 1.2 lbs/TBtu. *See id.* at 9367. Sources can chose to measure total filterable PM as a proxy for selenium or to measure selenium directly; the total PM limit is $3 \times 10^{-2}$ lb/MMBtu and the selenium limit is 5 lb/TBtu. *See id.* at 9367–68. The standards will go into effect at the Plant in Spring 2015. *See id.* at 9407. WildEarth has made no argument that the EPA would have selected standards more stringent than the MATS standards if it had regulated mercury and selenium in the FIP. We see no reason why the EPA cannot choose to regulate hazardous air pollutants and regional-haze pollutants, which are governed by different statutory provisions with different goals, in separate rulemakings. And if WildEarth is concerned that EPA's direct regulation of mercury and selenium under the MATS rule was not stringent enough, it can challenge that rule directly.

whenever it decides to address one or a few of them could only delay what is already a prolonged process.[11]

## III. CONCLUSION

WildEarth's main concern, that baghouses should have been included in the BART for Units 1–3, has been mooted by the closure of those units. And WildEarth has failed to identify any discretion of the EPA to otherwise reduce mercury and selenium pollution as part of the agency action at issue—promulgation of a FIP to reduce PM and $NO_x$ at the Plant.

We DENY WildEarth's petition for review.

---

[11] It is worth adding that if WildEarth had preserved its argument about regulation of $SO_2$, it would lose on the merits of that issue for the same reasons that it loses on the argument that the FIP should have directly regulated mercury and selenium. The EPA never proposed regulating $SO_2$ in this rulemaking. In the final FIP the EPA noted that it had examined $SO_2$ emissions in 2007 and that the comments it received about $SO_2$ in this rulemaking "essentially repackage[d] the comments [it] received and provided a response for on the 2007 FIP." Final FIP, 77 Fed. Reg. at 51638. EPA's inaction in regulating $SO_2$ is not an agency action that would trigger a duty to consult under the ESA.